UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

99 JUN 29 PM 2: 4.

U.S. DISTRICT COURT
N.D OF ALABAMA

| | | |
|---|---|---|
| DAVID AARON AND SHIRLEY AARON; | ) | CV95-S-493-NE |
| EMMITT MELTON AND MARIE MELTON; | | CV95-S-503-NE |
| ALVIN JONES AND DAPHNE JONES; | ) | CV95-S-504-NE |
| WILLIAM SULLINS AND REBECCA | | |
| SULLINS; | ) | CV95-S-505-NE |
| JAMES ROBERTS AND EDITH ROBERTS; | | CV95-S-506-NE |
| DANIEL DAVIS AND SHERRY DAVIS; | ) | CV95-S-507-NE |
| | | |
|    Plaintiffs, | ) | |
| | | |
| vs. | ) | |
| | | |
| LOUISIANA-PACIFIC CORPORATION; | ) | |
| RONNIE PAUL; | | |
| | ) | |
|    Defendants. | | |

**ENTERED**

**JUN 2 9 1999**

MEMORANDUM OPINION

This action is before the court on defendants' motion to exclude the testimony of four expert witnesses plaintiffs intend to call at trial[1]:  (1) Mark Cocco; (2) B.J. Stephens; (3) Richard Maloy; and (4) Alan Blotcky.  The court held a hearing on March 10, 1998.  Since that hearing, plaintiffs' counsel submitted a supplemental brief in opposition to defendants' motion and defendants filed a response. Upon consideration of the motion, the briefs in support of and in opposition thereto, the evidentiary

---

[1] Defendants actually filed two motions to exclude; the first on August 1, 1996 (Doc. No. 47); and the second on October 7, 1996 (Doc. No. 70).  This court will consider the filings as a single motion to exclude expert testimony.

83

submissions, and the oral arguments of counsel, this court finds

that defendants' motion is due to be granted in part and denied in

part.

## I. DISCUSSION

As an initial matter, this court will address the

applicability of the standard of admissibility reflected in *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786,

125 L.Ed.2d 469 (1993). In brief and during oral argument,

plaintiffs sought to avoid the application of the "*Daubert*

factors"[2] for this court's Rule 702 decision on the admissibility

of the challenged expert testimony. In essence, plaintiffs argued

that each challenged witness' respective opinions were based on

that person's experience in his particular field and that, as such,

---

[2] The *Daubert* Court identified factors courts should consider when deciding
whether expert opinions are reliable. These factors include, but are not limited
to a consideration of:

> --Whether a "theory or technique ... can be (and has been) tested";
> --Whether it "has been subjected to peer review and publication";
> --Whether, in respect to a particular technique, there is a high
>     "known or potential rate of error" and whether there are
>     "standards controlling the technique's operation"; and
> --Whether the theory or technique enjoys "general acceptance" within
>     a "relevant scientific community."
> 509 U.S., at 592-594, 113 S.Ct. 2786.

Kumho Tire Company, Ltd. v. Carmichael, ___ U.S. ___, 119 S.Ct. 1167, 1175 (March
23, 1999) (quoting *Daubert*). The *Daubert* Court also cautioned that the factors
it identified were not necessarily exhaustive: "Many factors will bear on the
inquiry, and we do not presume to set out a definitive checklist or test [,] [b]ut
some general observations are appropriate." 509 U.S. at 593, 113 S.Ct. at 2796.

2

the testimony was not "scientific." Although acknowledging that

Federal Rule of Evidence 702 requires this court to make a

determination regarding the relevance and reliability of expert

testimony, plaintiffs contend that the *Daubert* factors apply only

to testimony which is "scientific."

Plaintiffs found support for this argument in Eleventh Circuit

precedent: *Carmichael v. Samyang Tire, Inc.*, 131 F.3d 1433 (11th

Cir. 1997). In the interim, however, the Supreme Court reversed

*Carmichael*, holding that:

> *Daubert's* general holding — setting forth the trial
> judge's general "gatekeeping" obligation — applies not
> only to testimony based on "scientific" knowledge, but
> also to testimony based on "technical" and "other
> specialized" knowledge. *See* Fed. Rule Evid. 702. We
> also conclude that a trial court may consider one or
> more of the more specific factors that *Daubert* mentioned
> when doing so will help determine that testimony's
> reliability. But, as the Court stated in *Daubert*, the
> test of reliability is "flexible," and *Daubert's* list of
> specific factors neither necessarily nor exclusively
> applies to all experts or in every case. Rather, the law
> grants a district court the same broad latitude when it
> decides how to determine reliability as it enjoys in
> respect to its ultimate reliability determination.

*Kumho Tire Company, Ltd. v. Carmichael*, ___ U.S. ___, 119 S.Ct.

1167, 1171 (March 23, 1999), *reversing Carmichael v. Samyang Tire,*

*Inc.*, 131 F.3d 1433 (11th Cir. 1997). The Court went on to discuss

the requirements for admissibility under Rule 702: "The Rule ...

3

establishes a standard of evidentiary reliability ... [and] requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 1175 (internal quotation marks and citations omitted). The Court said that, when the bases of such testimony are called into question, "the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 1175 (internal quotation marks and citations omitted).

This court finds the *Carmichael* Court's application of *Daubert* principles to the opinions of an engineer pertinent to the inquiry at issue here.

> Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. ... In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.
>
> • • •
>
> At the same time, and contrary to the Court of Appeals' view, some of *Daubert*'s questions can help to evaluate the reliability even of experience—based testimony. In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience—based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

4

119 S.Ct. at 1175-76 (citations omitted).

**A.   Mark Anthony Cocco**

Plaintiffs proffer the testimony of Mark Anthony Cocco, ASP,
who would testify that defendant Louisiana-Pacific Corporation
("LPC") failed to conduct noise level studies before construction
of the Hanceville plant, that absent such failure LPC could have
reduced the noise levels at the plant, and that measures can be
taken now to reduce those noise levels.   Plaintiffs argue that
"Cocco's education and experience, the noise level readings taken
by himself and [another of plaintiffs' expert witnesses], and the
EPA standards which Cocco has used indicate that his testimony will
be useful and necessary to a jury in making a determination in
these matters."   (Plaintiffs' submission of March 30, at 2.)

Defendants cite Cocco's deposition testimony, demonstrating he
had never conducted a noise level study before he was retained for
purposes of this case, he did not know how to conduct one, and he
was unaware if having such a study performed is standard in the
industry.   (See Defendants' post-hearing brief, Doc. No. 82, at 1.)
Moreover, defendants identify weaknesses in Cocco's suggestions.
First, Cocco has no information and has conducted no analysis
regarding the feasibility of his suggestions.   Similarly Cocco does
not know whether implementation of his suggestions actually would

5

reduce the noise emitted from the plant.  (*See id.* at 2.)

This court finds the following colloquy, which occurred during

Cocco's deposition, material to the reliability determination:

> Q:   Can you tell me today any steps that Louisiana-Pacific
>      should have taken to reduce the noise in the plant?
>
> A:   Again, that would have to be determined through an
>      understanding of which machines were producing the worst
>      part of the noise.  Some suggestions possibly could be
>      putting the machines on a surface that is going to
>      attenuate the noise; insulate the sides of the building
>      and the roof maybe; maybe cover the noise sources to an
>      extent.   Another possibility would be looking at
>      different handling procedures in reducing the noise.
>
> Q:   Now, have you done any study to determine whether or not
>      any of these measures were feasible?
>
> A:   No.  But, again, I have, in past experiences with trying
>      to control noise exposure, have used some of these
>      methods.
>
> Q:   You haven't done any study to determine whether or not
>      any of these methods would have been feasible at
>      Louisiana-Pacific's plant in Hanceville?
>
> A:   No, I don't [*sic*].
>
> Q:   Have you done any study to determine if any of these
>      methods are standard in the industry?
>
> • • •
>
> A:   Oh, that, I don't know.
>
> Q:   And can you tell me how much, if at all, that any of
>      these measures would have reduced any noise emitted from
>      the plant?

6

A:     I guess I — I don't know that ....

● ● ●

Q:     Just to make sure I understand your answer, you don't
       know how much, if any, if at all, any of these measures
       would have reduced the noise emitted from the plant?

A:     No, I don't.

Q:     And you haven't done any study to try to determine that?

A:     I don't have nearly enough information to do that.

(Cocco deposition, at 59-62.)

Whether or not this court applied the factors delineated in

*Daubert*, Mr. Cocco's testimony is not reliable under Rule 702.

There is an insufficient tie to the Hanceville plant, making his

shaky suggestions too speculative. No analysis supports an opinion

that these measures feasiblely could be taken, or that they would

have success in abating the noise emissions of the Hanceville

plant. In fact, it is not clear upon what basis Mr. Cocco grounds

his suggestions, other than simply having seen some measures

employed in other noisy factories. Such an observation is far from

"expert." Instead, the suggestions found in Cocco's opinions are

not too far removed from the absurd suggestion the undersigned

facetiously offered during the hearing:  construct a Louisiana-

style "Super-Dome" over the plant. Although the respective

determinations of the efficacy, reasonableness, and feasibility of

7

such an extreme measure probably would be more facile, the suggestion certainly is not sufficiently reliable to be admitted under Rule 702. In short, this court finds that the flaws in the foundation of Cocco's opinions, which were exposed during the deposition, preclude the requisite finding of a "valid ... connection to the pertinent inquiry." *Carmichael*, 119 S.Ct. at 1175.

**B.   B. J. Stephens**

Plaintiffs also proffer the testimony of B. J. Stephens, Ph.D., P.E., a mechanical engineer who has offered opinions regarding measures LPC could take to reduce the level of noise emitted from the Hanceville plant. Defendants challenge this testimony as unreliable, because Stephens did not properly conduct a noise measurement, yet based his suggestions on an admittedly unreliable one, and because he has not conducted studies that he concedes would be necessary to determine whether implementing his suggestions at the Hanceville site would be effective or feasible.

With regard to the noise measurement Stephens relies upon, defendant identifies relevant language from *Carmichael*:

> The objective of [the *Daubert* gatekeeping] requirement is
> to ensure the reliability and relevancy of expert
> testimony. It is to make certain that an expert, whether
> basing testimony upon professional studies or personal

8

> experience, employs in the courtroom the same level of
> intellectual rigor that characterizes the practice of an
> expert in the relevant field.

119 S.Ct. at 1176.   Stephens testified that he had planned to
return to the plaintiffs' homes to conduct a proper sound
measurement, and that the single measurement he took on his
ultimately lone visit to the area was "not very reliable for doing
any type of research with."   (Stephens deposition, at 63.)
Stephens then described the procedure which would have to be
undertaken to yield reliable results.   Stephens neither conducted
nor relied upon a study following such procedures.   Thus, by his
own admission, the basis of Stephens' opinions regarding the noise
at the Hanceville site — *i.e.*, a single, unscientific measurement
— would not satisfy any of the *Daubert* factors.

Stephens suggests several procedures that LPC could implement
to abate the noise from the plant; yet, even on the date he
visited, Stephens was unaware if LPC had already taken many of
these steps, or if such steps would in fact reduce the noise
emitted.   In addition, Stephens has not analyzed the admittedly
questionable feasibility of some suggestions.   (*See* Stephens
deposition, at 101-110.)   In fact, by way of example, Stephens
offered a "[p]ie in the sky" suggestion strikingly similar to the

9

aforementioned proposal of the undersigned:  "[Y]ou could put the hopper inside a building, enclose the entire debarking area so that the trucks actually come into a building and are unloaded by the crane inside a building."   (*Id.* at 109.)   Not surprisingly, however, Stephens did not know if such a measure would prove economically feasible, or if any plant in the country had undertaken such a measure.  (*See id.*)

For the reasons stated above, including those discussed for the testimony of Cocco, the court finds the proposals Stephens would offer not sufficiently grounded to the facts of this case or to generally acceptable methods of analysis and, thus, inadmissible under Federal Rules of Evidence 702 and 403.

C.    **Richard A. Maloy**

Richard A. Maloy, MAI, SRA, J.D., will offer his opinions of the reduced market value of plaintiffs' homes caused by the noise emissions of the LPC plant.   Maloy performed a "Paired Sales Analysis" for each plaintiff's property under the "Sales Comparison Approach," which Maloy believes is the method most revealing of the effect external environmental factors such as noise have on property value.   In his analysis, Maloy "researched several other conditions and found a range of effect on value."    (Maloy

10

deposition, at 52.)   Maloy compared the effect of factors which
have a similar impact on market value in residential areas, such as
noise, lighting, and dense commercial activity.  Maloy testified
that "[i]t's fairly easy to draw a comparison between those
different influences."  (Id.)  Upon consideration of the reports
from the sound experts, interviews with plaintiffs, and visits to
the various properties, Maloy determined that the plaintiffs'
properties were effected at the lower end of the aforementioned
range.  Maloy said that determination was, as are all appraisals,
"an exercise in judgment."  (Id. at 53.)

During the deposition, defense counsel focused on the
comparison between the property at issue and one of the groups
Maloy used:  houses located near the Birmingham airport.  Counsel
targeted the validity of this comparison, noting that Maloy had
conducted noise measurements in neither area.  Ultimately, counsel
sought to undermine the expert analysis because the level of noise
emitted could not be established as closely similar.  That inquiry
notwithstanding, Maloy maintained that such a direct comparison of
decibel levels was not essential to finding an accurate,
proportionate range of effect on market value.  (Id. at 53-68.)  In
fact, Maloy said that, in following this standard form of analysis,

11

he used the documented impact of external factors other than noise in his analysis.

This court finds Maloy's well-documented analysis sufficiently relevant and reliable to satisfy the standards of admissibility in the Federal Rules of Evidence. That is not to say that such testimony will be immune from defense counsel's entirely appropriate line of inquiry on cross-examination, which may find receptive ears on a jury. As the *Daubert* Court said: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. at 2798.

### D. Alan D. Blotcky

Alan D. Blotcky, Ph. D., is a clinical psychologist who proposes to testify about various mental disorders which afflict plaintiffs. His opinions are founded upon a single interview with each plaintiff-couple, and not upon any testing. Dr. Blotcky identifies "dysthemic depressive disorder" as a condition to which plaintiffs have fallen prey, and one no available tests can confirm. (Plaintiffs' submission of March 30, at 3.)

Defendants challenge the reliability of this expert's

12

testimony.[3]    This court notes that Dr. Blotcky conducted all

interviews in one day at the office of plaintiffs' counsel.   Each

interview lasted roughly one hour, and all interviews were

conducted with the couples jointly — i.e., with the husband and

wife together, not individually.   Moreover, defendants cite a

portion of Dr. Blotcky's testimony relevant to his ability to

accurately diagnose the plaintiffs' psychological conditions in

such a cursory fashion:

> Q:   Are you aware of any literature or any material that is
>      used in your profession to determine when a noise level
>      is sufficient to cause some disturbance in people?
>
> A:   I don't know that in the psychological literature.   I'm
>      sure it's there somewhere, but I'm not familiar with it.
>      You mean like decibel level or that kind of stuff?
>
> Q:   It's not something that you're familiar with and use on
>      a regular basis?
>
> A:   I'm not familiar with it and I don't use it.

(Blotcky deposition, at 43-44.)   Plaintiff argues, however, that

Dr. Blotcky relied upon the Diagnostic and Statistical Manual in

his evaluation of plaintiffs.   The court notes that Dr. Blotcky was

cognizant of those guidelines, but that he finds them "somewhat

flexible" and did not necessarily rely on them.   (Id. at 42.)

---

[3] Defendants also challenge the relevance of this testimony, contending
that mental anguish damages are not recoverable in this action where no physical
injury is alleged.   The court addresses this objection in a separate order.

13

The court finds this testimony to be little or nothing more than Dr. Blotcky vouching for the plaintiffs' testimony.  Dr. Blotcky's conclusory analysis shows no effort to eliminate or account for the many other factors that may bear on plaintiffs' psychological well-being, or on any disorder that may exist.  Such testimony is unreliable and should be excluded under Rules 702 and 403.

## II. CONCLUSION

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this __29th__ day of June, 1999.

_____
United States District Judge

14